HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

3BA INTERNATIONAL LLC,

              Plaintiff,

    v.

KEVIN LUBAHN, et al.,

              Defendants.

CASE NO. C10-829RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on a motion for summary judgment from Plaintiff 3BA International LLC ("3BA"), a motion for summary judgment from Defendant Kevin Lubahn, and Mr. Lubahn's motion requesting trial by jury.  For the reasons stated herein, the court GRANTS 3BA's motion (Dkt. # 101) in part and DENIES it in part, GRANTS Mr. Lubahn's summary judgment motion (Dkt. # 106) in part and DENIES it in part, and GRANTS Mr. Lubahn's motion for a jury trial (Dkt. # 99).  This order concludes with a summary of the claims remaining for trial and an additional deadline for submissions in advance of the July 16, 2012 trial.

## II.  BACKGROUND

Before 3BA was a limited liability company ("LLC"), it was Mr. Lubahn's brainchild.  Mr. Lubahn's interest in some version of a three-on-three basketball

1   organization dates back to the 1990s.  In 2000, he filed copyright registrations for a

2   "3BA" logo and a 3BA rulebook, as well as trademark registrations for the 3BA name

3   and logo.  These copyright and trademark registrations, along with the domain name

4   registrations for 3BA.com, 3BA.org, and 3BA.net (collectively the "3BA Intellectual

5   Property") feature prominently in this dispute.  In the 2000s, Mr. Lubahn had helped

6   organize some three-on-three basketball events using the 3BA name and logo.  By 2006,

7   he had registered the internet domain name 3ba.com, and had developed a 45-page

8   business plan for a professional three-on-three basketball league.  Lubahn Decl. (Dkt.

9   # 110), Ex. D.

10          In 2007, Mr. Lubahn met Larry Claunch.  There is no dispute that they entered a

11  business relationship, although they hotly dispute the terms of that relationship.  There is

12  no question that in December 2007 they formed the LLC that is the Plaintiff in this suit.

13  Claunch Decl. (Dkt. # 103), Ex. A.  The operating agreement, which Mr. Lubahn and Mr.

14  Claunch signed in December 2007, made Mr. Claunch the sole member of the LLC, and

15  made Mr. Lubahn and Mr. Claunch the LLC's managers.  *Id.*  For the sake of

16  completeness, the court notes that in November 2007, Mr. Lubahn signed a promissory

17  note obligating him to repay Mr. Claunch $200,000.  Lubahn Decl. (Dkt. # 110), Ex. G.

18  The court has no idea if Mr. Claunch gave Mr. Lubahn money or anything else in

19  exchange for the note.  The court has no idea why Mr. Lubahn executed the note.

20          Mr. Lubahn insists that Mr. Claunch promised to make him an owner of half of the

21  3BA business.  There is some evidence in the record to support that claim.  Mr.

22  Claunch's attorney, while forwarding the December 2007 operating agreement to Mr.

23  Lubahn and Mr. Claunch, suggested that the only obstacle to making Mr. Lubahn a half

24  owner of the LLC was his pending bankruptcy.  Lubahn Decl. (Dkt. # 110), Ex. I (Dec.

25  18, 2007 email).  In July 2008, the same attorney emailed both Mr. Lubahn and Mr.

26  Claunch a revised operating agreement that would have made Mr. Lubahn a member of

27  the LLC, albeit a member with no voting rights.  *Id.*, Ex. N.  There is no evidence that

1  Mr. Lubahn or Mr. Claunch ever signed this revised operating agreement or any revised

2  operating agreement.

3      Mr. Lubahn's bankruptcy features prominently in one aspect of 3BA's corporate

4  existence – Mr. Claunch's acquisition of Mr. Lubahn's 3BA Intellectual Property.  Mr.

5  Lubahn filed a bankruptcy petition in May 2007, and received a discharge in September

6  2007.  Lubahn Decl. (Dkt. # 110), Exs. F, H.  Nowhere in his petition did he disclose his

7  ownership of the 3BA Intellectual Property.  The record suggests that it was Mr.

8  Claunch's idea (likely in consultation with his attorneys) to reopen Mr. Lubahn's

9  bankruptcy to formally acquire the 3BA Intellectual Property.  Eventually, he was

10  successful.  In September 2008, the bankruptcy judge issued an order granting the

11  trustee's motion to approve the sale of the 3BA Intellectual Property to Mr. Claunch.

12  Claunch Decl. (Dkt. # 103), Ex. B.  The order declared Mr. Claunch a good-faith

13  purchaser of the 3BA Intellectual Property in accordance with 11 U.S.C. § 363(m),

14  incorporating by reference a September 2008 asset purchase agreement in which *Mr.*

15  *Lubahn's bankruptcy estate* transferred ownership of the 3BA Intellectual Property to Mr.

16  Claunch.  *Id.*, Ex. C.[1]  The bankruptcy court retained jurisdiction to implement the order

17  and asset purchase agreement, and to resolve any disputes "arising under or related to the

18  [asset] Purchase Agreement" as well as any disputes "regarding liens, claims, or interests

19  asserted against the [Intellectual] Property."  *Id.*, Ex. B.

20      For a few years after its formation, 3BA attempted to succeed with Mr. Lubahn as

21  its manager.  There are some hints of progress.  For example, in February 2010, Lewis

22

23  _____

24      [1] The trustee of Mr. Lubahn's bankruptcy estate signed the asset purchase agreement, and
that agreement named the estate as the seller of the 3BA Intellectual Property.  Claunch Decl.

25  (Dkt. # 103), Ex. C.  This suffices to dispense with Mr. Lubahn's insistence that the trustee
disclaimed the bankruptcy estate's interest in the 3BA Intellectual Property.  The evidence on

26  which Mr. Lubahn relies reveals only that the trustee abandoned the estate's interest in what the
trustee described as "3 x 3 basketball tournament software."  Lubahn Decl. (Dkt. # 110), Ex. J

27  (Jan. 31, 2008 letter).

1    Hill signed a memorandum of understanding to become the owner of a 3BA franchise in

2    Texas.  Claunch Decl. (Dkt. # 103), Ex. D.[2]  The memorandum did not bind Mr. Hill to

3    do anything, but it memorialized his interest in an agreement that would have required

4    him to pay a $200,000 initial franchise fee and to pay annual fees of at least $100,000

5    beginning in 2015.  *Id.* ¶¶ 9-10.  The memorandum did, however, contain a

6    confidentiality agreement in which both parties promised to keep the terms of the

7    memorandum a secret.  *Id.* ¶ 3.

8         By April 2010, Mr. Lubahn and Mr. Claunch were apparently at odds.  There is

9    little in the record (other than Mr. Lubahn and Mr. Claunch's fingerpointing) to explain

10   why.  There is ample documentation, however, that Mr. Lubahn and others working at

11   3BA conspired to either take over 3BA or start a different league that would also be

12   called "3BA."  The most revealing documents are the minutes of two late April meetings.

13   On April 23, Mr. Lubahn held a conference call with Kevin Ellis and James Ballard to

14   discuss forming two new companies, "3BA Properties and Global Basketball Association

15   or 3BA Global."  Finnie Decl. (Dkt. # 104), Ex. A.  Mr. Lubahn planned to transfer the

16   3BA Intellectual Property to 3BA properties, although he did not acknowledge that he no

17   longer owned the 3BA Intellectual Property.  *Id.*  They planned a four-game exhibition

18   tour.  Most tellingly, the conspirators discussed "when to drop the bomb on 3BA,"

19   including Mr. Claunch.  *Id.*  They planned to resign from 3BA at an April 30 meeting in

20   Dallas.  *Id.*  On April 26, Mr. Lubahn and others held another conference call, discussing

21   many of the same topics.  *Id.*  The conspirators developed a timeline for the first 18

22   months of their league and drafted an organizational hierarchy.  *Id.*, Exs. B, C.  On April

23   27, Mr. Lubahn sent an email to Mr. Hill (and others) outlining some of his plans.  The

24   email does not explicitly declare whether he and his co-conspirators planned to break

25

26        [2] The copy of the memorandum of understanding in the record bears no signatures.  Mr.
     Lubahn insists that he watched Mr. Hill sign it.  At least for purposes of these motions, no one
27   disputes that assertion.

1    away from 3BA, but it suggests as much.  Because there is no evidence in the record

2    from Mr. Hill himself, the court can only speculate to what extent he was aware of Mr.

3    Lubahn's conspiracy.  Among other things, the email reiterated Mr. Lubahn's plan to

4    transfer the 3BA Intellectual Property to his newly-created holding company.  The email

5    did not acknowledged that Mr. Lubahn did not own the 3BA Intellectual Property;

6    indeed, it acknowledged no dispute over the ownership of that property.  The record

7    reveals numerous later instances in which Mr. Lubahn told others that he owned the 3BA

8    Intellectual Property.  There is no need to list them here.

9         Mr. Lubahn also used his status as the administrator of 3BA's internet domains to

10   secretly make himself a recipient of a copy of every email to or from a person with a 3BA

11   email address.  Ford Decl. (Dkt. # 11) ¶ 6.

12        Mr. Lubahn apparently intended to launch his conspiracy at an April 30 meeting

13   with Mr. Hill and others.  When a 3BA employee who was not part of the conspiracy

14   contacted Mr. Hill to discuss the meeting, Mr. Hill expressed confusion about her

15   involvement in the meeting.  Ford Decl. (Dkt. # 11) ¶ 4.  In the ensuing conversation, Mr.

16   Hill revealed enough of Mr. Lubahn's plan to alert 3BA.  Mr. Hill never followed

17   through on his intent to purchase a 3BA franchise, although there is no evidence that

18   reveals his reasons.

19        Mr. Claunch fired Mr. Lubahn on April 29, 2010.  Claunch Decl. (Dkt. # 103),

20   Ex. E.  For a few days, Mr. Lubahn retained control over the 3BA website.  There is no

21   indication that he used that control to do anything, and he relinquished control of the

22   websites on or about May 1, 2010.  Ford Decl. (Dkt. # 11) ¶ 5; Chen Decl. (Dkt. # 12)

23   ¶¶ 7-9.

24        3BA sued Mr. Lubahn in May 2010.  This court entered a temporary restraining

25   order and then a preliminary injunction preventing Mr. Lubahn from soliciting 3BA

26   investors and franchisees, using documents he obtained from 3BA, using the Intellectual

27

ORDER- 5

1   Property or claiming ownership of it, and accessing 3BA's password-protected computer

2   systems.

3          Pending before the court are 3BA's motion for summary judgment on all of its

4   claims and against Mr. Lubahn's purported counterclaims, Mr. Lubahn's motion for

5   summary judgment against all of 3BA's claims,[3] and Mr. Lubahn's motion to clarify that

6   a jury will act as the finder of fact at the July 16 trial.  The court now turns to these

7   motions.

8                      III.  SUMMARY JUDGMENT MOTIONS

9          On a motion for summary judgment, the court must draw all inferences from the

10  admissible evidence in the light most favorable to the non-moving party.  *Addisu v. Fred*

11  *Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is appropriate

12  where there is no genuine issue of material fact and the moving party is entitled to a

13  judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party must initially show

14  the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

15  323 (1986).  The opposing party must then show a genuine issue of fact for trial.

16  *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The

17  opposing party must present probative evidence to support its claim or defense.  *Intel*

18  *Corp. v. Hartford* Accident *& Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).  The

19  court defers to neither party in resolving purely legal questions.  *See Bendixen v.*

20  *Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

21

22

23  ————————————

24       [3] Mr. Lubahn's motion for summary judgment also includes his complaints about 3BA's
    alleged failure to allow him to obtain discovery from the 3BA laptop that he once used.  This
25  discussion has no place in a summary judgment motion, particularly where the parties have been
    ordered to raise any discovery dispute by first contacting the court.  Mar. 23, 2012 ord. (Dkt.
26  # 91) at 7.  So far as the court is aware, the parties have resolved this discovery dispute.  The
    court will not discuss it further.
27

A.    3BA's Claims

The court turns first to 3BA's many claims.  3BA believes it is entitled to summary judgment on all of them; Mr. Lubahn believes he is entitled to summary judgment on all of them.  The court considers 3BA's claims one at a time, reserving its discussion of Mr. Lubahn's purported counterclaims for Part III.B, *infra*.

### 1.    Tortious Interference

3BA believes that Mr. Lubahn tortuously interfered with its business relationship with Mr. Hill, the investor who entered the February 2010 memorandum of understanding to purchase a Texas-based 3BA franchise.  3BA is entitled to its belief, but it is mistaken in its view that "undisputed facts" establish that Mr. Lubahn tortuously interfered.  It is apparent that Mr. Hill was one of the targets of Mr. Lubahn and his conspirators, but there is no competent evidence as to why Mr. Hill decided not to purchase a 3BA franchise.  No party has provided any evidence from Mr. Hill himself. 3BA speculates that Mr. Hill decided not to follow through on his purchase of a franchise because of Mr. Lubahn's interference.  That is possible.  It is also possible that Mr. Hill ultimately decided that he would prefer not to invest a minimum of $200,000 in a league that played no games, had no teams, and offered very little promise of success.  Even if Mr. Lubahn interfered with 3BA's relationship with Mr. Hill (an issue the court does not decide), and even if Mr. Lubahn's interference was improper (an issue the court does not decide), 3BA has not offered indisputable evidence that the interference was the cause of any damage.

The same evidence, however, shows why the court cannot grant summary judgment against this claim to Mr. Lubahn.  A jury could, on this evidence, conclude that he knowingly targeted 3BA's relationship with Mr. Hill, used improper means to interfere with it, and caused Mr. Hill to decide not to invest in 3BA.

1              2.      **Breach of Fiduciary Duty**

2          To prevail on its claim of breach of fiduciary duty, 3BA would first have to

3  correctly identify what duties Mr. Lubahn owed.  Mr. Lubahn was a manager of 3BA, but

4  not a member.  3BA mistakenly assumes that a manager in an LLC owes the same duties

5  as a corporate board member or officer.  The only duties an LLC manager owes are

6  statutory duties and duties that the LLC operating agreement imposes.  *Dragt v.*

7  *Dragt/DeTray, LLC*, 161 P.3d 473, 481-82 (Wash. Ct. App. 2007).  By statute, LLC

8  members and managers owe a duty that is similar a corporate board member's duty of

9  loyalty.  RCW § 25.15.155.  They must account to the LLC for profits or benefits they

10 acquire in transactions related to the LLC's business, including the use of its property and

11 "confidential and proprietary information."  RCW § 25.15.155(2).  LLC managers are, by

12 statute, liable only for "gross negligence, intentional misconduct, or a knowing violation

13 of the law."  RCW § 25.15.155(1).

14         3BA's operating agreement both imposes additional duties on Mr. Lubahn and

15 relieves him of others.  *See* RCW 25.15.155 (noting that an LLC agreement may modify

16 statutory duties).  The operating agreement requires Mr. Lubahn to act in good faith.

17 Claunch Decl. (Dkt. # 103), Ex. A, ¶ 2.4.  It also absolves Mr. Lubahn of any duty of

18 loyalty to 3BA.  *Id.* ¶ 2.9 ("The Manager . . . may engage in other business activities and

19 may pursue business opportunities competitive with the business and operations of the

20 Company without presenting any such opportunity to the Company . . . .").

21         Whereas 3BA ignores Mr. Lubahn's authorization to pursue competing business;

22 Mr. Lubahn believes it absolves him of all liability.  Mr. Lubahn was free to pursue

23 competing business opportunities.  He was not, however, free to use unlawful means to

24 do so.  To the extent that he competed with 3BA lawfully, he breached no fiduciary duty.

25 To the extent that he acted unlawfully and sabotaged 3BA, he may have breached his

26 duty of good faith.  The record includes evidence from which a factfinder could conclude

27 that Mr. Lubahn did not act in good faith, including but not limited to his attempt to

1    misappropriate the 3BA Intellectual Property, dishonesty, and covert acts that undercut

2    3BA.  The record does not, however, mandate a finding of bad faith.  3BA's claim for

3    breach of the duty of good faith will await resolution at trial.

4            **3.        Trade Secrets and Confidential Information**

5            To prevail on a claim of misappropriation of a trade secret, 3BA must first prove

6    that it has trade secrets.  Washington law defines a "trade secret" as "information,

7    including a formula, pattern, compilation, program, device, method, technique, or

8    process" that "[d]erives independent economic value, actual or potential, from not being

9    generally known to, and not being readily ascertainable by proper means by, other

10   persons who can obtain economic value from its disclosure or use."  RCW

11   § 19.108.010(4).  The owner of the trade secret must also make "efforts that are

12   reasonable under the circumstances to maintain its secrecy."  *Id.*

13          3BA claims that its "confidential lists of investors, sponsors, vendors, contracts

14   and game-related materials such as designs of the game ball and floor" are trade secrets.

15   3BA Mot. (Dkt. # 101) at 12.  There is no evidence (short of Mr. Claunch's conclusory

16   statements) that this information was not generally known, not readily ascertainable, or

17   that it was subject to efforts to keep it confidential.  3BA seems to believe that because it

18   stored some of this information on password-protected computers, it was automatically a

19   trade secret.  3BA is again mistaken.  There is, for example, no evidence that 3BA

20   attempted to hide the names of its potential investors.  There is, moreover, no evidence

21   that 3BA's potential investors attempted to hide their identities.  The same is true of

22   3BA's sponsors and vendors.  Indeed, 3BA has not identified a single sponsor or vendor.

23   Similarly, 3BA does not identify what "game-related materials," including the "designs

24   of the game ball and floor" were either confidential or the subject of efforts to keep them

25   confidential.

26          The only "confidential" contract that 3BA identified was the memorandum of

27   understanding with Mr. Hill.  There is no evidence, however, that Mr. Lubahn used

1  information from that contract.  At most, he used the fact that he knew Mr. Hill was

2  interested in becoming an investor.  That information, by itself, is not a trade secret.

3         3BA's claim for trade secret misappropriation fails as a matter of law for at least

4  the reason that it has failed to identify any potential trade secret other than its contract

5  with Mr. Hill.  As to the vast majority of the alleged "trade secrets," including the

6  contract with Mr. Hill, there is also no evidence that Mr. Lubahn misappropriated them.

7         3BA's claims regarding "confidential information" fail for the same reason.  3BA

8  has failed to identify with specificity any "confidential information" that Mr. Lubahn

9  misappropriated.[4]

10         **4.**      **Fraudulent Misrepresentation and Defamatory Statements**

11         3BA brings a fraud claim based on Mr. Lubahn's statements to Mr. Hill that he

12  owned 3BA's intellectual property.  Rather than list all of the many ways in which this

13  claim misapprehends the law governing a fraud claim, the court will point to the simplest

14  defect: if Mr. Lubahn made fraudulent statements to Mr. Hill, then it is Mr. Hill's job to

15  sue Mr. Lubahn for fraud.  3BA has no standing to vindicate Mr. Hill's interests.

16         3BA also bases a defamation claim on Mr. Lubahn's statements about his

17  ownership of the 3BA Intellectual Property.  The court agrees that Mr. Lubahn's

18  statements about his ownership of the 3BA Intellectual Property were false as a matter of

19  law.  The court does not agree, however, that 3BA has shown damage as a matter of law

20  arising from Mr. Lubahn's false statements about ownership of the intellectual property.

21  3BA may have suffered damage, but a jury must decide that issue.

22         Before leaving this subsection, the court pauses to put a rest to Mr. Lubahn's

23  incessant claim that he is the rightful owner of the 3BA Intellectual Property.  To begin,

24  _____

25      [4] 3BA does itself no favors by misciting legal authority.  3BA claims that the court in

26  *Hansen v. Friend*, 824 P.2d 483 (Wash. 1992) discussed a "confidentiality claim."  3BA Mot.
(Dkt. # 101) at 11.  *Hansen* analyzes a negligence claim arising from a social host's provision of

27  liquor to a minor.  *Hansen* has nothing to do with confidentiality.

Mr. Lubahn lost ownership of that property even before Mr. Claunch acquired it.  It
became the property of his bankruptcy estate.  It was the bankruptcy trustee who sold it to
Mr. Claunch, not Mr. Lubahn.  Mr. Lubahn insists that Mr. Claunch deceived him in
connection with the proceedings that led to that sale, and induced him to agree to the sale
under false pretenses.  Perhaps Mr. Lubahn is right.  In this court, however, it is an
indisputable fact that Mr. Lubahn does not own the 3BA Intellectual Property.  The
bankruptcy court did not merely authorize the trustee's sale of the 3BA Intellectual
Property to Mr. Claunch, it reserved jurisdiction over all disputes related to that sale.  Put
simply, if Mr. Lubahn wishes to establish himself as the owner of the 3BA Intellectual
Property, the sole forum in which he may do so is the bankruptcy court.  Until he does so,
he is not, as a matter of law, the owner of the 3BA Intellectual Property.

### 5.    Lanham Act

Some of the minutes and other documents that Mr. Lubahn authored and used
during his 2010 efforts to undermine 3BA used 3BA's trademarked name and logo.  Mr.
Lubahn admits that he and his conspirators had not decided whether to continue to use
the 3BA name or whether to develop a new name and logo for their company.

3BA stretches the law, however, by claiming that Mr. Lubahn infringed its
trademarks in violation of the Lanham Act by using the 3BA name and logo.  The
Lanham Act bars only the use of trademarks in a way that is likely to cause confusion
about the origin of the trademarked goods or services.  The only example of confusion to
which 3BA points is Mr. Hill's apparent confusion about whether Mr. Lubahn was
representing 3BA or his competing enterprise when he approached him in April 2010.
There is no evidence, however, that this confusion arose from Mr. Lubahn's use of 3BA's
trademarks.  At best, it arose from Mr. Lubahn's failure to clearly reveal his conspiracy to
usurp 3BA.  The Lanham Act does not apply in this situation.

### 6.   Computer Fraud and Abuse Act and Stored Communications Act.

Mr. Lubahn used his status as the administrator of the 3BA website and internet domains to secretly make himself a recipient of every email sent from a 3BA account. He also used his status to temporarily deny 3BA access to its own website after 3BA fired him.

The Computer Fraud and Abuse Act ("CFAA") provides a civil cause of action for some instances of unauthorized computer access. 3BA points to a provision that bars unauthorized access to a computer to obtain "information from any protected computer." 18 U.S.C. § 1030(a)(2). It also relies on a provision that prohibits the furtherance of an "intended fraud" by unauthorized access to a protected computer. 18 U.S.C. § 1030(a)(4). To prevail in a CFAA civil action, however, 3BA must also prove one of the five aggravating factors enumerated in 18 U.S.C. § 1030(c)(4)(A)(i). 18 U.S.C. § 1030(g). The only aggravating factor that 3BA even mentions is that the conduct caused a loss in a one-year period of at least $5,000. 18 U.S.C. § 1030(c)(4)(A)(i)(I). 3BA has provided no evidence of a loss of $5,000 or more arising from Mr. Lubahn's violation of the CFAA. 3BA therefore cannot, as a matter of law, prevail on its CFAA claim.

3BA fares no better in its invocation of the Stored Communications Act. That statute provides a civil action for someone who intentionally accesses an electronic communication service either without authorization or in excess of authorization and thereby obtains access to an electronic communication stored on that service. 18 U.S.C. § 2701(a), § 2707(a). 3BA has no evidence at all that Mr. Lubahn accessed a stored communication *after* 3BA fired him. Before 3BA fired him, Mr. Lubahn was a manager, empowered to manage 3BA as he saw fit. That he chose to spy on the communications of 3BA employees perhaps makes him an unethical manager, but it does not violate the Stored Communications Act.

### 7.   The Racketeer Influenced Corrupt Organizations Act

3BA devotes just over a page of its motion to obtaining summary judgment on its claim under the Racketeer Influenced Corrupt Organizations Act ("RICO").   A civil RICO claim is among the most complicated of federal statutory claims.   It requires a plaintiff to establish, among other things, a pattern of statutorily-defined "racketeering activity."   *See* 18 U.S.C. § 1964(c) (establishing civil action for person injured by violation of 18 U.S.C. § 1962); 18 U.S.C. § 1962 (defining offenses based on participation in "racketeering activity"); 18 U.S.C. § 1961(1) (listing dozens of federal criminal statutes constituting racketeering activity).   3BA does not explain which predicate violations Mr. Lubahn has engaged in, other to suggest in wholly cursory fashion that he "commit[ed] wire fraud and interfere[ed] with commerce."   3BA has fallen well short of even outlining a viable RICO claim, much less prevailing on one as a matter of law.   On the evidence 3BA has presented, no reasonable jury could rule in 3BA's favor on its RICO claim.   Moreover, in light of 3BA's perfunctory effort to support its RICO claim with either evidence or argument, the court rules that 3BA has abandoned its RICO claim.

### B.   Mr. Lubahn's Counterclaims.

Before considering Mr. Lubahn's purported counterclaims, the court must consider whether Mr. Lubahn has properly pleaded any counterclaims.   Mr. Lubahn's initial answer to 3BA's complaint included no counterclaims.   In August 2010, he filed a motion for leave to submit an amended answer and counterclaims.   Before the court ruled on that motion, Mr. Lubahn filed his amended answer and counterclaims without leave of court.   In December 2010, the court issued an order declining to resolve Mr. Lubahn's motion to amend while the court determined whether or not Mr. Lubahn had agreed to settle this case.   Dkt. # 67.   In May 2011, the court issued an order ruling that Mr. Lubahn had not settled his claims.   Dkt. # 74.   That order included instructions to the parties to submit a joint status report stating, among other things, whether they wished to amend

1  any pleadings, including counterclaims.  *Id.*  In the joint status report, Mr. Lubahn stated
2  no more than a generic wish to "amend his pleadings," without mentioning any
3  counterclaims.

4      On this record, it is apparent that Mr. Lubahn's filed his counterclaims without
5  obtaining leave of court.  The court now retroactively grants him leave.  The court must
6  grant leave to amend freely, where justice so requires.  Fed. R. Civ. P. 15(a)(2).  3BA has
7  been on notice since October 2010 of Mr. Lubahn's counterclaims.  The court declines to
8  deny Mr. Lubahn a forum to present his claims, particularly where 3BA has not hesitated
9  to heap its own claims on him.

10     The court now turns to the substance of the counterclaims.  Mr. Lubahn's October
11 2010 counterclaim purports to enumerate causes of action for breach of contract,
12 "misappropriation," breach of fiduciary duty, unfair competition, tortious interference,
13 defamation, and wrongful termination.  Dkt. # 60.  In the instant motions, however, Mr.
14 Lubahn wisely abandons these claims (many of which are wholly without support)[5] in
15 favor of two "basic claims."  Lubahn Opp'n (Dkt. # 110) at 12.  He first claims that Mr.
16 Claunch breached a contract to make him a 50% owner of 3BA.  He next claims that Mr.
17 Claunch fraudulently obtained title to the 3BA Intellectual Property.

18     The court cannot consider either of Mr. Lubahn's counterclaims.  First, whatever
19 the merits of Mr. Lubahn's claim that he had an agreement with Mr. Claunch to become a
20 50% owner of 3BA, that agreement was with *Mr. Claunch*.  Mr. Claunch is not a
21 defendant in this case.  The court suggests no opinion on whether Mr. Lubahn has a valid
22 breach-of-contract claim against Mr. Claunch, it merely rules that if he wanted to bring
23 that claim in this litigation, he was obligated to formally name Mr. Claunch as a
24 defendant much sooner.

25

26     [5] To pick just one example, Mr. Lubahn's wrongful termination counterclaim ignores that
    the 3BA operating agreement gave Mr. Claunch the right to fire him at any time, with or without
27 cause.  Claunch Decl. (Dkt. # 103), Ex. A ¶ 2.1.

1    Second, the court has already explained why Mr. Lubahn cannot prevail on his

2   claim that Mr. Claunch fraudulently obtained title to the 3BA Intellectual Property.  The

3   bankruptcy court has already adjudicated that claim, and has retained jurisdiction over

4   any challenge to Mr. Claunch's title to the property.  This court is not the proper forum

5   for Mr. Lubahn to contest ownership of the 3BA Intellectual Property.  For purposes of

6   this litigation, Mr. Claunch (or the person or entity to whom he later transferred it) is the

7   undisputed owner of the 3BA Intellectual Property.

8                    **IV.  MOTION FOR A JURY TRIAL**

9    Both 3BA and Mr. Lubahn requested a jury trial in their initial pleadings.  Compl.

10  (Dkt. # 1) ¶ 11; Answer (Dkt. # 26) ¶ 11.  Both parties ignored this District's local rules,

11  which require a pleading demanding a jury trial to prominently display the phrase "JURY

12  DEMAND" on the first page of the pleading.  The court, finding no apparent jury

13  demand, set this matter for bench trial.

14    Mr. Lubahn now insists on a jury trial.  3BA prefers a bench trial.  Neither party

15  has cited a shred of authority in support of their positions.  The court cannot, however,

16  decline to honor a jury demand merely because a party ignores local rules that are

17  designed to ensure that the court is aware of a jury demand.  *Pradier v. Elespuru*, 641

18  F.2d 808, 811 (9th Cir. 1981) ("The demand for a jury trial having been properly made

19  under Fed. R. Civ. P. 38(b), the failure to fulfill an additional requirement of a local rule

20  to place a notation to that effect in the title cannot constitute a waiver of a trial by jury.");

21  *see also* Fed R. Civ. P. 83(a)(2) ("A local rule imposing a requirement of form must not

22  be enforced in a way that causes a party to lose any right because of a nonwillful failure

23  to comply.").  Both parties' jury demands complied with Federal Rule of Civil Procedure

24  38(b)(1).  Mr. Lubahn preserved his right to a jury trial, and 3BA's belated preference for

25  a bench trial makes no difference.

26

27

## V.  CONCLUSION

For the reasons stated above, the court GRANTS 3BA's summary judgment motion (Dkt. # 101) in part and DENIES it in part, GRANTS Mr. Lubahn's summary judgment motion (Dkt. # 106) in part and denies it in part, and GRANTS his motion for a jury trial (Dkt. # 99).  This order eliminates all of Mr. Lubahn's counterclaims as well as the following 3BA claims:

1) any claim for breach of a fiduciary duty other than the duty of good faith;

2) any claim for misappropriation of a trade secret or confidential information;

3) any claim for fraud or fraudulent misrepresentation;

4) any Lanham Act claim;

5) any CFAA or Stored Communications Act claim;

6) any RICO claim.[6]

Trial will begin on July 16, 2012.  The only claims at issue will be as follows:

1) 3BA's tortious interference claim;

2) 3BA's claim for breach of Mr. Lubahn's duty of good faith;

3) 3BA's claim for defamation.

The court's May 10, 2012 scheduling order includes no deadline for jury instructions.  The court orders the parties to submit jury instructions in accordance with Local Rules W.D. Wash. CR 51 and an agreed pretrial order no later than July 6, 2011. The parties shall comply with all other deadlines stated in the May 10 order.

Dated this 18th day of June, 2012.

*Richard A Jones*

The Honorable Richard A. Jones
United States District Court Judge

---

[6] 3BA's complaint included a claim for conversion.  Mr. Lubahn targeted that claim in his summary judgment motion, and 3BA did not respond.  The court rules that 3BA abandoned any conversion claim.